IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 4:12-CV-000220-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| WILLIAM I. COCHRAN, III; WRC, | ) | |
| LLC; EKP, LLC; EMLAN | ) | |
| PROPERTIES, LLC; and RICHARD A. | ) | |
| COCHRAN, | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on defendants' motion for summary judgment (DE 102), and motion for sanctions (DE 112). Also before the court is plaintiff's motion to exclude proposed defense expert Bernard E. Kane, Jr., PhD, ("Dr. Kane") (DE 104). These motions have been fully briefed. In this posture, the issues raised are ripe for adjudication. For the following reasons, the court denies defendants' motions, denies without prejudice plaintiff's motion, and directs scheduling of a bifurcated trial.

## STATEMENT OF THE CASE

In September 2012, plaintiff filed complaint asserting a claim under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-3619, against individual defendant William I. Cochran, III ("Cochran") and the various entities under which he has managed residential rental properties, namely defendants WRC, LLC ("WRC"); EKP, LLC ("EKP"); and EmLan Properties, LLC ("EmLan"). Plaintiff seeks damages on behalf of certain tenants and associated persons asserted to

be "aggrieved persons" allegedly injured by defendants' discriminatory conduct. Plaintiff also seeks declaratory and injunctive relief, as well as a civil penalty. Plaintiff demands trial by jury.

In February 2013, defendants filed a motion to dismiss for failure to state a claim and motion for attorneys' fees. The court denied the motion to dismiss in May 2013, and subsequently dismissed the motion for attorneys' fees without prejudice. On September 19, 2013, plaintiff filed, with leave of court, an amended complaint, adding Richard A. Cochran ("Richard Cochran"), Cochran's brother, as a defendant.

Plaintiff moved to strike defense expert Dr. Kane on September 20, 2013, arguing that the disclosure of Dr. Kane as a defense expert was untimely. The court denied the motion and allowed an extension of discovery for deposition of Dr. Kane. On December 30, 2013, plaintiff moved for leave to identify six additional witnesses on whose behalf it may seek damages as "aggrieved persons." In opposition, defendants moved to strike designation of two additional witnesses, Justice Blow and Sterling Council, as "aggrieved persons. The court denied the motion for leave, and also denied defendants' motion to strike. The court noted that, after the court's decision on summary judgment, defendants may seek to take depositions of Blow and Council, if issues remain, prior to trial.

Defendants moved for summary judgment on January 14, 2014, and plaintiff moved to exclude defense expert Dr. Kane the next day. Defendants filed a motion for sanctions on February 13, 2014.

The facts may be summarized as follows, "taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

Defendant Cochran manages twenty (20) residential rental properties in Washington, North Carolina, that are or were owned by defendants Cochran, WRC, EKP, EmLan, or Richard Cochran. Cochran primarily handles daily management of these residential properties. His duties include leasing units, collecting rent, receiving tenants' maintenance requests, performing or arranging for maintenance, and initiating and prosecuting eviction proceedings against tenants. Cochran does so acting as the agent of defendants WRC, EKP, EmLan, and Richard Cochran.

A number of defendants' current and former tenants who are black have experienced problems with appliances, utilities, and structures, in their rental units. These tenants have at various times reported these problems to Cochran and requested repairs or replacements necessary to make their rental units habitable. In some instances, described in more detail below and in the court's discussion herein, Cochran refused to or failed to provide necessary repairs or replacements. Some of these tenants have withheld or refused to pay rent demanded due to Cochran's failure to provide necessary repairs or replacements. Cochran initiated eviction proceedings against some of these tenants who had been withholding or refusing to pay rent due to lack of sufficient repairs or replacements. With respect to several of these tenants, Cochran directed racial slurs and made other racial statements, described as follows in chronological order, in connection with the provision of repairs or initiation of eviction proceedings.

3

1.   Ronnie and Della Boyd

Ronnie and Della Boyd (sometimes "the Boyds") began living at 803 North Market Street, a rooming house, in approximately 2001.  The Boyds asked Cochran to repair or remedy various items in their unit, including sink and tub, hot water heater, fuse box, heating system, and washer and dryer. Cochran did not do so.  Ronnie Boyd made repairs to his unit but Cochran refused to give him credit. Regarding Cochran's communications with them and other tenants in the rooming house, Della Boyd testified in a deposition as followed:

> I've heard him use nigger all of the time . . . . Q.  So every time you saw him he would say what?  A.  "These niggers don't know how to keep my house. . . . And I'll get their asses out of here, and I wish I had never put them in here . . . . I want to get them out of my house. I should have never put them in there. . . . Worst mistake I ever made," stuff like that. . . . Q. Okay. And who – who else heard – who else heard the comments?  A.  Everybody that was in there [the rooming house], I can't remember everyone's name. . . . But I know they heard it; they were told it, some of them. (DE 121-62 at 18-19).[1]

Ronnie Boyd also worked for Cochran doing repair work on other rental units.  He testified that Cochran remarked about what he ate for lunch around other co-workers, saying "Oh, you know [Boyd's] going to get the – black people really love fried chicken, now, watch him." (DE 121-63 at 30).  He often addressed Boyd by calling him names, including "nigger," (id. at 39), and he would say "you need to get your black hind part on" in directing him to work faster. (Id. at 41).

Boyd testified:

> Q. . . . Back to the names . . . and the words that Mr. Cochran would use, the N-word and – and – did you ever tell him that the use of that word made you feel uncomfortable?  A.  I said it plenty of times. . . . I told him straight up, I said, "I really don't like that . . . I would never talk to you like that. . . ." Q. Okay.  What was his response?  A. . . . "I don't give a rat's ass if you don't like it." (DE 121-63 at 92).

---

[1]  The references to block quotes in the text are to deposition transcripts, with quotation marks and punctuation added in some instances by the court for clarification.  Page numbers are those specified on the exhibit itself, not the page number automatically stamped upon docketing.

The Boyds moved out in approximately 2003 after Cochran posted eviction notices on the door of their unit.

### 2. Cynthia and Lora Grimes

Cynthia Grimes and her mother, Lora Grimes (sometimes "the Grimeses"), rented units at 624 and 626 North Market Street, starting in approximately 2002. The Grimeses asked Cochran to repair or remedy various items in their units, including leaking sink, faulty refrigerator, insufficient heaters, roaches, and rats. Cochran did not do so sufficiently or timely. Regarding Cochran's communications with them, Cynthia Grimes testified:

> We had one altercation that we had got into . . . for him [Cochran] fussing with my mother about stating that she owed him some money. . . . And he just kept going on and on and on, . . . so it kind of frustrated me. [S]o we – me and him got into it. . . . I don't know exactly word for word that we had but it wasn't a nice argument. We called each other names and – Q. What did he call you? A. Well, whatever he felt was suitable at the time, such as my race, my color, had called me the N. . . ." (DE 121-60 at 18-19).

Lora Grimes testified:

> Q. . . . Well, what are some of the things that he's called you? A. He's called me a black B, he's called me a B, he's called me a stupid B. Q. And when you say B do you mean bitch? A. Yes. . . . Okay. And . . . in what sense did he use these words . . .[?] A. Because he said, "Y'all always need something done and something's always got to be fixed, things have always got to be done, and always complaining about something." (DE 121-61 at 36-37).

The Grimeses moved out in approximately 2007.

### 3. Josette Cruz

Josette Cruz ("Cruz") rented a unit owned by defendants at 621 North Market Street, commencing in approximately April 2007. Cruz asked Cochran to repair an electrical panel in her unit that was discharging current outside of the fuses. Cochran "kept . . . blowing [her] off" about

the repair. (DE 121-39 at 53). Around that same time, Cochran had several contacts with Cruz.

Cruz testified as follows:

> A. . . . He's come to my home and said after I move out another – another ignorant
> nigger is going to move in. . . . He pretty much said, you know, I'm on the bottom
> of the totem pole because, you know, I'm black and I'm a woman, and he said so
> many different times that, you know, . . . nigger to me, and I can't recollect every
> time he said it. But there were specific times when he said it where I got real
> offensive. (DE 121-39 at 39).

Cruz also testified as follows:

> Q. . . . [H]ow many times did he come to your house with the purpose of intimidating
> you? A. It was quite a bit of — pretty much on a day to day basis. Q. Okay. Over
> what period of time? A. The time from which we moved back in and I made a
> complaint about the heat and about the sparking. Before that he would come by just,
> you know, say give me my money and he would make a slanderous remark to me[.]
> (DE 121-39 at 40).

David Caddigan ("Caddigan"), a legal aid attorney representing Cruz, wrote a letter dated

August 24, 2007, to Cochran demanding that he make repairs. (DE 121-46). Several days later, Cruz

discovered that her back door was boarded up. (DE 121-39 at 53). She walked to the front door and

found Cochran laughing and placing a piece of plywood that was shaped and decorated like a white

ghost at the front door. (Id.). Cochran told her,

> "I got your little threat from your lawyer[.] Remember these words: You're black,
> I'm white, you're in the South now, you'll never win against me. . . .You don't know
> who you're f'ing with. The same people who you're going to help for are the same
> people I get on the boat with and have barbecues with." (Id. at 54).

That same day, Cruz contacted Caddigan about the incident. (DE 121-45). Caddigan called

Cochran to discuss the incident, and Cochran blamed Cruz for the problems in the house and said

he was not going to make any repairs. At one point during the call, Cochran made a statement in

which he remarked that Cruz's children were "jumping around like monkeys." (Id.).

6

4. Terisha Lynn

Terisha Lynn ("Lynn") rented a unit owned by defendants at 1740 Asbury Church Road,

commencing in approximately August 2008.  Lynn asked Cochran to repair or replace a refrigerator

in her unit, in addition to noting other items in need of repair or replacement.  In response, Cochran's

"exact words was he wasn't getting a nigger a refrigerator." (DE 121-16 at 34).  Cochran also did

not fix the other items in need of repair or replacement.  After Lynn withheld rent because Cochran

did not make repairs, Cochran obtained a  "Judgment in Action for Summary Ejectment" against

Lynn, which Lynn satisfied. (DE 121-30, DE 121-31).  Nevertheless, Cochran obtained a writ of

possession to evict Lynn, which was executed in or around February, 2009.

5. Earlean Windley

Earlean Windley ("Windley") rented the same unit at 624 North Market Street, commencing

in approximately January, 2009.  Windley asked Cochran to repair or remedy various items in her

unit, including insufficient heaters, exposed wiring, broken windows, stove, and bathroom fixtures.

Cochran did not do so.   Consequently, Windley withheld partial rent.    Regarding her

communications with Cochran, Windley testified:

> "[T]he very last time that I saw Mr. Cochran to receive his rent, which he did not get,
> he actually told me – he thought, You people knew how to get money.  Now, I can't
> tell you what he meant by 'you people.'  He pointed as he said it.  I know the
> neighborhood – I know what the neighborhood is that we live in, you know.  So that
> bothered me because what is 'you people'?" (DE 121-8 at 34).

Because Windley withheld rent, Cochran evicted her in July 2009.

6. Tommy and Julia Clark

Tommy and Julia Clark (sometimes "the Clarks") rented a unit owned by defendants at 115

East 12th Street, along with Julia Clark's adult daughter, Tammy Grimes, starting in approximately

7

March 2009.  The Clarks asked Cochran to repair various items in their unit, including mold, heat, stove, doors, and sink.  Cochran did not do so.  The Clarks began withholding rent because Cochran refused to make repairs.  Regarding Cochran's communications with the Clarks, Tammy Grimes testified:

> " . . . . Did you hear Mr. Cochran make any derogatory statements about your race?  A.  Well, the only thing I heard Mr. Cochran say when he came in to pick up the rent money from my mom, and my mom wouldn't give him the money, he said, That's why I don't like renting to black people because they don't pay."  (DE 121-35 at 67-68).

Thereafter, Cochran commenced eviction proceedings, and the Clarks were evicted approximately ten (10) months after moving in.

7.  Lorrie Reddick

Lorrie Reddick ("Reddick") rented a unit at 508 Aycock Street, starting in approximately June 2012.  Reddick asked Cochran to repair or address various issues with her unit, including a leaking roof and sink, insufficient heat, and roaches.  Cochran failed to sufficiently or timely address these issues. Reddick incurred expenses in renting an electric fireplace to warm the residence.  Regarding Cochran's communications with her, Reddick testified:

> "Q. . . . Other than the heating issues that you had and the issues with the sink that you had and the roaches, were there any other issues in the home?  A. . . . yes. I have several issues.  I have issues about how [Cochran] speaks to me . . . when I'm discussing matters.  Like when I was telling him and discussing about things that was going on, I have to hear you people always fall short around about this time [during the Thanksgiving and Christmas holidays]. . . . Q. And when he said you people who was he referring to?  A.  There won't nobody in the house but black people."  (DE 121-68 at 23).

Reddick moved out in 2013 because Cochran was not making repairs.

Cochran also made remarks disparaging of black employees providing maintenance services on the rental properties.  For example, Cynthia Grimes testified that she heard Cochran call his black

8

employees "nigger" when asking them to get maintenance supplies from under the house where she was renting a unit. (DE 121-60 at 54).

In addition, Cochran made remarks disparaging of black tenants in discussions with white tenants. Casey and Joseph Cannon, who are white, moved into 766 Swan Point Road in approximately 2003. Prior to moving in, Cochran told them, unprompted, that they could not use kerosene heaters in the house, but "you're not black, so I don't have to tell you that." (DE 121-71). When Casey Cannon informed Cochran that they were having a roach infestation, Cochran said that "didn't surprise him because the previous tenants were black and not clean." (Id.). Cochran sent a pest control service within a day or two to remedy the problem. (Id.).

In addition to the incidents described above, a number of black tenants experienced maintenance problems that they reported to Cochran, but which Cochran did not repair or failed to timely or sufficiently repair.

## DISCUSSION

A.   Motion for Summary Judgment

1. Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party then must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Only disputes between the

parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Similarly, "[c]redibility determinations . . . are jury functions, not those of a judge." Id. at 255. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id.; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "a reasonable jury could reach only one conclusion based on the evidence," or when "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

2.      Analysis

a.      Legal Framework

The court previously introduced the legal framework for plaintiff's FHA claims, in its order

denying defendants' motion to dismiss. The court repeats and augments that discussion here as

necessary in light of the evidence presented. The FHA, as the name indicates, was enacted to

provide fair housing throughout the United States. 42 U.S.C. § 3601. Section 804 of the FHA

prohibits discrimination "in the terms, conditions or privileges of . . . rental of a dwelling, or in the

provision of services or facilities in connection therewith, because of race [or] color," and statements

"with respect to the . . . rental of a dwelling that indicate[] any preference, limitation, or

discrimination based on race [or] color . . . or an intention to make any such preference, limitation,

or discrimination." 42 U.S.C. § 3604(b)-(c). Furthermore, section 817 makes it "unlawful to coerce,

intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of

his having exercised or enjoyed . . . any right granted or protected by [section 804]." 42 U.S.C. §

3617.

The government may only bring suit for violations of the FHA in limited circumstances. In

particular,

> Whenever the Attorney General has reasonable cause to believe that any person or
> group of persons is engaged in a pattern or practice of resistance to the full
> enjoyment of any of the rights granted by this subchapter, **or** that any group of
> persons has been denied any of the rights granted by this subchapter and such denial
> raises an issue of general public importance, the Attorney General may commence
> a civil action in any appropriate United States district court.

42 U.S.C. § 3614 (a) (emphasis added). Plaintiff raises two alternate theories for bringing suit in

this case. First, plaintiff asserts that defendants engaged in a "pattern or practice" of resistance to

the full enjoyment of rights granted by the FHA. Second, plaintiff asserts that defendants denied

a "group of persons" of rights granted by the FHA and that such denial raises an issue of general public importance. The court will consider the standard for each in turn.

i. Pattern or Practice

To establish a pattern or practice of discrimination, "the Government ultimately ha[s] to prove more than the mere occurrence of isolated or accidental or sporadic discriminatory acts." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 336 (1977) (internal quotations omitted). "It ha[s] to establish by a preponderance of the evidence that racial discrimination was the [defendants'] standard operating procedure – the regular rather than the unusual practice." Id. "A pattern or practice [is] present only where the denial of rights . . . is repeated, routine, or of a generalized nature." Id. at 336 n. 16.

In the Teamsters case, the court addressed the standard for determining a pattern of practice of employment discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-6, which contains identical language to the first clause of the FHA enforcement provision. The similarity in language "accounts for our reliance on the . . . judicial interpretation of [§ 2000e-6] in our construction of the words in [the FHA enforcement provision]." United States v. Hunter, 459 F.2d 205, 216 n.12 (4th Cir. 1972).

"At the initial, 'liability' stage of a pattern-or-practice suit," the government's "initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by [a defendant] or group of [defendants]." Id. at 360. The government's initial burden can be met "by statistics alone, . . . or by a cumulation of evidence, including statistics, patterns, practices, general policies, or specific instances of discrimination." Equal Employment Opportunity Comm'n v. Am. Nat. Bank, 652 F.2d 1176, 1188 (4th Cir. 1981). "Under a proper analysis, all of

the evidence, statistical and nonstatistical, tending to establish a prima facie case should first [be] assessed on a cumulative basis." Id. at 1189.

Although not required, a pattern of discriminatory decision making "might be demonstrated by examining the discrete decisions of which it is composed." Teamsters, 431 U.S. at n. 46. Case law applying this standard – most frequently arising in the Title VII employment discrimination context – demonstrates that the inquiry into whether a pattern or practice exists is highly fact-specific and depends on the context and circumstances of each case. In some circumstances, an attempt to prove a pattern or practice "may fail even though discrimination against one or two individuals has been proved." Cooper v. Federal Reserve Bank of Richmond, 467 U.S. 867, 878 (1984). In Cooper, the Fourth Circuit, in its decision preceding the Supreme Court decision, held that two instances of individual discrimination in promotion of employees from one pay grade to the next in a bank, where there were approximately 150 employees in the lower pay grade, were not sufficient to support a finding of a pattern or practice of racial discrimination. See Equal Employment Opportunity Comm'n v. Federal Reserve Bank of Richmond, 698 F.2d 633, 644 (4th Cir. 1983) judgment reversed on other grounds by Cooper, 467 U.S. at 882.

Similarly, in Ste. Marie v. Eastern Railroad Association, 650 F.2d 395, 405 (2d Cir. 1981), the court held that seven acts of discrimination, consisting of five denials of promotions and two rejections of applications, across certain departments of a national association, could not, without more, support a finding of pattern or practice of purposeful discrimination. Likewise, in King v. Gen. Elec. Co., 960 F.2d 617, 628 (7th Cir. 1992), the court expressed doubt that six instances of discrimination, in the form of lay-offs of older employees where younger employees were retained, could constitute a pattern or practice in the context of a reduction of workforce involving two

hundred (200) employees.  See also Apsley v. Boeing Co., 691 F.3d 1184, 1203 (10th Cir. 2012)

("[A]cross a workforce of over 10,000 people in three locations, the handful of statements the

Employees cite constitute only evidence of 'isolated or sporadic discriminatory acts.'").

By contrast, in Equal Employment Opportunity Comm'n v. Ford Motor Co., 645 F.2d 183,

197 (4th Cir. 1981), judgment reversed on other grounds by Ford Motor Co. v. Equal Employment

Opportunity Comm'n, 458 U.S. 219, 224 n. 5 (1982), the court found a pattern of discrimination in

hiring, based on a single contested hiring decision in a two year period, where the decision amounted

to a "total exclusion of women from permanent employment."  In United States v. Pelzer Realty Co.,

Inc., 484 F.2d 438, 445 (5th Cir. 1973), the court found a pattern or practice of discrimination under

the FHA based upon defendants' treatment of two prospective black purchasers during the course

of a period of several weeks of negotiations.  See also United States v. Mintzes, 304 F. Supp. 1305,

1314 (D. Md. 1969) (finding pattern or practice in fair housing violations based upon unlawful

representations to the owners of three properties). In sum, "the definition of a pattern or practice is

not capable of a precise mathematical formulation."  Ste. Marie, 650 F.2d at 406.

"[T]he District Court's initial concern is in deciding whether the Government has proved that

the defendant has engaged in a pattern or practice of discriminatory conduct."  Teamsters, 431 U.S.

at 342 n. 24.  In making this determination, once the government has established a prima facie case

that such a pattern or practice exists, "[t]he burden then shifts to the employer to defeat the prima

facie showing  . . . by demonstrating that the Government's proof is either inaccurate or

insignificant." Id. at 360.   The "defense must, of course, be designed to meet the prima facie case

of the Government," but there are otherwise no "particular limits on the type of evidence [a

defendant] may use" to do so.  Id. at 360 n. 46.  For example, a defendant may "provide a

14

nondiscriminatory explanation for the apparently discriminatory result" of a particular pattern or practice. Id. However, "[a]ny nondiscriminatory justification offered by the [defendant], will be subject to further evidence by the Government that the purported [justification] was in fact a pretext for unlawful discrimination." Id. at 362 n. 50 (citing McDonnel Douglas Corp v. Green, 411 U.S. 792, 804-06 (1973)).[2]

"When the Government seeks individual relief for the victims of the discriminatory practice, a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." Id. at 361. "[T]he question of individual relief does not arise until it has been proved that the employer has followed an employment policy of unlawful discrimination." Id. However, "[w]ithout any further evidence from the Government, a court's finding of a pattern or practice justifies an award of prospective relief . . . [which] might take the form of an injunctive order." Id. at 361. In addition, "proof of a pattern or practice supports an inference that any particular . . . decision, during the period in which the policy was in force, was made pursuant to that policy." Id. at 362.

## ii. Group of Persons

Case precedent addressing the standard for denial of rights to a "group of persons" is limited. Unlike the "pattern or practice" standard, the "group of persons" standard in the FHA enforcement government provision has no analog in the Title VII government enforcement provision. See

---

[2] "There is little case authority discussing summary judgment motions in pattern-or-practice cases." Thiessen v. Gen. Elec. Capital Corp., 267 F.3d 1095, 1108-09 (10th Cir. 2001). Although not previously discussed in depth in the Fourth Circuit, the Second Circuit recently opined in the context of a pattern-or-practice lawsuit that "if the defendant satisfies its burden of production, the presumption arising from the plaintiff's prima facie case drops out, and the trier of fact must then determine, after a full trial, whether the plaintiff has sustained its burden of proving by a preponderance of the evidence the ultimate fact at issue," namely that "intentional discrimination was the defendant's 'standard operating procedure.'" United States v. City of New York, 717 F.3d 72, 87 (2d Cir. 2013).

Hunter, 459 F.2d at 216 n.12 ("The [legislative] reason for creating an alternative ground for suit [in the FHA provision] is unexplained."). The Fourth Circuit addressed the "group of persons" standard over forty years ago in Hunter, and has not since discussed the standard.[3]

In Hunter, the court held that the government had established denial of rights to a group of persons raising an issue of general public importance, following a trial, where the defendant published two classified advertisements tendering for rent an apartment in what was denominated a "white home." Hunter, 459 F.2d at 209 & 217. The court determined that the facts did not support a finding of a "pattern or practice" of discrimination, where the second advertisement was printed without the defendant's authorization. Id. at 217. In addressing denial of rights to a group, however, the court observed:

> Relief may be based on a single (unintentional) violation of the Act when by that violation a group of persons are denied their statutory rights and the case raises an issue of general public importance. Here the rights of all nonwhites looking for an apartment were abridged by the illegal advertisements published in [the newspaper].

Id. at 218 n. 17. According to the court in Hunter, a case raises an issue of general public importance when "the points of law involved in it are of major significance or the particular decision will constitute a precedent for a large number of establishments." Id. at 218 (quotation omitted). The court further opined in dicta that the "question whether pattern or practice of resistance or a case of general public importance has been shown is for the court to determine." Id. at 217 n. 13; but see United States v. Bob Lawrence Realty, Inc., 474 F.2d 115, 125 n.14 (5th Cir. 1973) (opining that

---

[3] A handful of cases have referenced Hunter or its holding, but these do not discuss the "group of persons" standard. See, e.g., United States v. Warwick Mobile Home Estates, Inc., 537 F.2d 1148, 1150 (4th Cir. 1976) (discussing holding in Hunter to deny injunctive relief but grant declaratory relief); see also Corey v. Sec'y, U.S. Dept. of Housing, 719 F.3d 322, 323 (4th Cir. 2013) (citing Hunter for "ordinary listener" standard for discriminatory publications); United States v. Southern Management Corp., 955 F.2d 914, 916 (4th Cir. 1992) (noting that the jury returned a verdict finding no pattern or practice of discrimination, but suggesting that it instead found a denial of rights to a group of persons).

"[i]t is not for the District Court to determine when an issue of public importance justifying the intervention of the Attorney General is raised," but rather a determination left to the discretion of the Attorney General).

b. Application

i. Pattern or Practice

This case presents a close question regarding the application of a pattern or practice of discrimination. Unlike many pattern or practice cases evaluated by the Supreme Court and the Fourth Circuit, plaintiff has not introduced any statistical evidence of discrimination. Rather, plaintiff seeks to prove a pattern or practice by anecdotal evidence of failures to repair and racially derogatory statements. Despite the limited range of evidence forecasted, considered cumulatively in the light most favorable to plaintiff, the evidence in its entirety supports an inference of a systematic practice or policy to deprive black Americans' rights guaranteed under the Fair Housing Act on the basis of their race.

Plaintiff's most compelling evidence constitutes direct evidence of discrimination or other statements revealing a motivation to make housing decisions on the basis of race. For example, Lynn testified that Cochran stated "he wasn't getting a nigger a refrigerator," which testimony is corroborated by declarations of her two sons. (DE 121-16 at 34).[4] Cruz testified that Cochran kept "blowing [her] off" about repairs, and said that after she moved out "another ignorant nigger is going to move in." (DE 121-39 at 39). After she demanded repairs, Cochran placed a ghost on her front

---

[4] Lynn's son, Justice Blow, stated similarly in a declaration: "Our refrigerator was also broken for a while. . . . Mr. Cochran would not fix our refrigerator. One day when Mr. Cochran was at our house and my mother asked him to give us a working refrigerator, I heard him say, 'I'm not going to get no nigger a new refrigerator.'" (DE 121-28 at 1). Lynn's other son, Sterling Council, stated: "One day when Mr. Cochran was at our house, I heard him say 'nigger' when he and my mother were talking about problems in the house. I and my brother were there when Mr. Cochran said this." (DE 121-32 at 1).

door and stated "You're black, I'm white, you're in the South now, you'll never win against me." (Id. at 53). Boyd testified that Cochran referred to disrepair at a boarding house, stating "[t]hese niggers don't know how to keep my house . . . And I'll get their asses out of here and I wish I had never put them in here." (DE 121-62 at 18-19). The Grimeses testified that Cochran argued with them about maintenance requests calling them "nigger" and "black bitch." (DE 121-60 at 18-19, and DE 121-61 at 36-37). Tammy Grimes testified that, upon withholding rent due to failure to repair, Cochran said "[t]hat's why I don't like renting to black people because they don't pay." (DE 121-35 at 67-68).

Additional instances, although less direct, permit an inference of discrimination in the provision of housing benefits. For instance, Reddick testified that Cochran failed to sufficiently repair problems in her unit, and when she incurred expenses to fix them, Cochran stated "you people always fall short" around the holidays. (DE 121-68 at 23). Windley testified similarly that she withheld rent due to lack of repairs, and Cochran stated "[I] thought [y]ou people knew how to get money." (DE 121-8 at 34). In addition, Cochran's statements to the Cannons, who are white, may permit the inference that Cochran was motivated by race in his provision of housing benefits. With respect to prohibiting use of kerosene heaters, he said to them "you're not black, so I don't have to tell you that," and with respect to a roach infestation, he said that "didn't surprise him because the previous tenants were black and not clean." (DE 121-71).

Further circumstantial evidence, while not in itself sufficient or essential to liability, may contribute to a finding of pattern or practice of discrimination, particularly with regard to whether defendants were motivated by race in housing decisions. Evidence of this nature includes testimony that Cochran used racial slurs in referring to maintenance employees, including Boyd, in directing

them in their work. (DE 121-60 at 54; 121-63 at 92). Boyd also testified that Cochran "listened to the white tenants," in the rooming house and treated them with "more dignity and respect." (DE 121-62 at 16-17, 25-26). Cochran completed repairs for the Cannons and another white tenant, Gina Horton ("Horton"), in a manner suggesting a preference of white tenants over black tenants. (DE 121-71 and 121-72; DE 121-73). For example, Horton testified that her refrigerator broke down, she called Cochran, and he brought a new refrigerator that same day. (DE 121-73 at 40).

Considering the most direct evidence of individual instances of discrimination, together and cumulatively with other instances permitting an inference of discrimination, when viewed in the light most favorable to plaintiff, the evidence is sufficient to establish a prima facie case of a pattern or practice of discrimination in violation of the Fair Housing Act. In particular, the evidence supports an inference of a pattern or practice of discrimination in the "the terms, conditions, or privileges" of rental, or interference with exercise of rights of a tenant, through withholding repair and maintenance, in violation of 42 U.S.C. § 3604(b) or § 3617. See 24 C.F.R. § 100.65 (prohibited actions under § 3604(b) include "[f]ailing or delaying maintenance or repairs . . . because of race"); Bloch v. Frischholz, 587 F.3d 771, 780-782 (7th Cir. 2009) (en banc) (holding that violation of § 3604(b) and § 3617 may be based upon post-rental management and administration of rental units by condo association); see also Radcliffe v. Avenel Homeowners Ass'n, Inc., No. 7:07-CV-48-F, 2013 WL 556380, at *5 (E.D.N.C. Feb. 12, 2013) (recognizing that "a plaintiff [can] sue on the basis of post-acquisition conduct under § 3604 and § 3617"); United States v. Matusoff Rental Co., 494 F.Supp.2d 740, 743 (S.D. Ohio 2007) (finding, in part, violation of § 3604(b) where the landlord

instructed maintenance worker not to repair or replace appliance in the apartment of black tenant, and discouraged him from performing maintenance on units of black tenants).[5]

In making this determination on summary judgment, the court notes several points bearing on its consideration of the evidence. First, the court's assessment of plaintiff's prima facie case is dependent upon viewing witness testimony as credible in the light most favorable to plaintiff, necessarily taking into account the most compelling direct evidence of discrimination described in the testimony of Cruz and Lynn, which defendants strongly dispute, as discussed below. To the extent plaintiff fails to establish those instances of discrimination at trial, support for its prima facie case of a pattern or practice of discrimination is greatly reduced, and the court will have cause to visit again the legal sufficiency of plaintiff's prima facie case.

In the absence of statistical evidence of discrimination, because the number of individual instances of discrimination supported by the most direct evidence in this case is relatively low, establishing those instances of discrimination is critical to plaintiff's case. For example, the instances of discrimination described above comprise less than twenty (20) instances found sufficient in Chisolm v. United States Postal Service, 665 F.2d 482, 495 (4th Cir. 1981), and the forty (40) instances presented in Teamsters, 431 U.S. at 338. But they also comprise more than the two instances found lacking in Federal Reserve Bank, 698 F.2d at 643. The court is mindful that

---

[5] Plaintiff also asserts, in the alternative, that statements made by Cochran support an inference that defendants made "statement[s] . . . with respect to the sale or rental of a dwelling that indicate[] any preference, limitation, or discrimination based on race . . . or an intention to make any such preference, limitation or discrimination," in violation of 42 U.S.C. § 3604(c). Plaintiff has not cited, however, any court case finding a violation of this provision based on statements made to existing tenants, although the Fourth Circuit has suggested as much in dicta. See Corey v. Sec. U.S. De't of Hous. & Urban Dev., 719 F.3d 322, 326 (4th Cir. 2013) (stating "[n]or does it matter that [the landlord] did not refuse to rent to [plaintiffs]; the statute simply prohibits statements to renters that indicate a limitation based on [protected status].")). The court need not reach this question at this time, where the court has determined based upon evidence forecasted a pattern or practice of violations of § 3604(b) or § 3617, and where many of the statements asserted to violate § 3604(c) also are probative to determining a violation of § 3604(b) or § 3617.

specific comparison to those cases, and others, is imperfect, in light of the overall size and structure

of the organization involved. While these cited cases involved employment discrimination in the

context of large companies and organizations, each with hundreds of employees, this case involves

discrimination in the context of twenty (20) rental properties.

Second, for purposes of the present motion, the court declines to rely upon some of the

evidence plaintiff relies upon in support of its prima facie case of a pattern or practice of

discrimination, where plaintiff has not demonstrated the probative value of the evidence. For

example, plaintiff cites to testimony by a number of additional black tenants, to the effect that they

did not receive maintenance or repairs as requested, including Kila Whitfield, Shenta Spencer,

Sheree Hill, Laurcretia Guilford, Belinda Dudley, Rosetta Tucker, Maisha Griffin, and Vanessa

Baily. Plaintiff presents no evidence, however, that those additional tenants were denied

maintenance or repairs because of their race.

While plaintiff suggests that the sheer volume of black tenants who were denied maintenance

or repairs is significant to its prima facie case, plaintiff offers no statistics or even details regarding

the total number of tenants, their race, and their periods of occupancy, to support this suggestion.

Absent more at this time, evidence regarding additional black tenants apart from those involved in

the individual instances of discrimination identified above is not probative of plaintiff's prima facie

case. Of course, in the event plaintiff does establish its prima facie case, such evidence may be

probative in determining the appropriate remedy and scope of individual relief. See Teamsters, 431

U.S. at 362.

Third, the court has considered and rejected defendants' arguments in support of summary

judgment. As an initial matter, the court rejects defendants' argument that internal inconsistencies

in the statements of Cruz and Lynn render that testimony insufficient as a matter of law to support plaintiff's case. For example, defendants point out that Lynn's statements in prior state court litigation focused on failure to repair a broken rear door, and not a refrigerator. (See DE 103-49 at US00000187). Such inconsistencies, however, go to the credibility of Lynn's testimony, categorically within the province of the fact finder to weigh and consider. Anderson, 477 U.S. at 255. Likewise, defendants' criticism of the testimony of plaintiff's witnesses generally on the basis that it is "fanciful," "conclusory," "implausible," or "plainly perjurious," (Reply at 4-5) is for the jury to consider. With respect to the evidence identified by the court above, the testimony when viewed in the light most favorable to plaintiff as it must be at this stage, is in fact specific, plausible, and grounded in specific instances of conduct.[6]

The court also rejects defendants' suggestion that the weight of the evidence in their favor warrants judgment as a matter of law. For example, defendants forecast evidence that, for each of the eight tenants identified above who have testified as to specific instances of discrimination, Cochran had significant legitimate reasons for withholding further repairs, insisting on rent payments, and proceeding with eviction. Defendants also forecast evidence that, in rebuttal to the specific instances of discrimination alleged in testimony introduced by plaintiff, Cochran never made the challenged statements and in fact treated all of his tenants fairly and with respect. (E.g.,

---

[6] Roberts v. Fairfax County Public Schools, 858 F.Supp.2d 605 (E.D. Va. 2012), cited by defendants, is inapposite and instructively distinguishable. There, the court granted summary judgment in favor of an employer public school system, where plaintiff asserted claims of race discrimination and hostile work environment. The court found that use of a racial slur on two occasions was insufficient to establish a hostile work environment. Id. at 611. Further, the court held that plaintiff's testimony was insufficient to create a genuine issue of material fact, where she had not produced "a single verified statement from any witness who support[ed] [plaintiff's] recollection" of confrontations with her supervisors. Id. In the present case, by contrast, plaintiff has presented testimony of not just one individual but rather multiple individuals as to the use of a racial slur in connection with the provision of housing benefits.

DE 103-22, -23, -24, -25, -26, -27, -28, -29).  Defendants indeed present evidence of considerable weight and probative force.

Nonetheless, as with credibility determinations, "at the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 249.  The evidence defendants have raised is sufficient to meet its burden of production to counter plaintiff's prima facie case, <u>see</u> <u>Teamsters</u>, 431 U.S. at 360, but it is not sufficient for judgment as a matter of law in their favor.  Rather, it creates a jury issue as to whether plaintiff has established a pattern or practice of discrimination.  <u>See</u> <u>id.</u> at 360 n. 46 & n. 50.

Defendants also argue that some of the statements by Cochran cited by plaintiff in support of its prima facie case do not indicate to the "ordinary listener" any racial preference.  (Reply at 9). For example, defendants argue that Cochran's statements that blacks use kerosene heaters, certain black tenants are "not clean," and references to Cruz's children as "monkeys," do not indicate a racial preference.  (<u>Id.</u>).  To determine whether a statement indicates a "preference, limitation, or discrimination" based on protected status, "courts use an 'ordinary listener' standard." <u>Corey</u>, 719 F.3d at 326.  "If an ordinary listener would believe that the statement suggests a preference, limitation, or discrimination based on a protected status, the statement is deemed discriminatory." <u>Id.</u>  At this stage in the case, viewing the evidence in the light most favorable to plaintiff, whether the cited statements suggest preference, limitation, or discrimination based on race is a genuine issue of disputed fact for the jury to resolve.

In sum, plaintiff has forecasted evidence sufficient to raise a genuine issue of fact as to whether defendants engaged in a pattern or practice of race discrimination in the provision of repairs

and maintenance to black tenants. The court in its discretion will bifurcate trial proceedings in this matter to address first in a "liability" phase of the trial whether plaintiff has established a prima facie case of a pattern or practice of discrimination, on the basis of evidence presented in accordance with the foregoing discussion.

ii. Group of Persons

As noted above, plaintiff seeks to proceed on an alternative theory that a "group of persons has been denied . . . . rights granted by [the FHA] and such denial raises an issue of general public importance." 42 U.S.C. § 3614 (a). Plaintiff does not distinguish the evidence it offers in support of this alternative theory of relief from that in support of its "pattern or practice" approach. Indeed, plaintiff suggests that the same evidence that supports a finding of "pattern or practice" of discrimination would also support a finding of denial of a "group of persons" rights granted by the FHA. (See Resp. at 31-32).

Limited guidance in Hunter suggests that a "group of persons" claim is warranted in circumstances where the government asserts a violation on the basis of a publication or discriminatory statement that is broadcast to a wide group of people, even if that publication or statement appears only once or twice, as in Hunter. See 459 F.2d at 218 n. 17 ("Relief may be based on a single (unintentional) violation of the Act when by that violation a group of persons are denied their statutory rights and the case raises an issue of general public importance."). The language of the statute, however, does not limit claims under the "group of persons" prong to those circumstances.

For purposes of the present ruling on summary judgment, where the court has determined that certain evidence forecasted, as set forth in the preceding section, may support a prima facie case

based on a "pattern or practice" of discrimination, it follows that the same evidence may also support a prima facie case of denial of rights to a "group of persons." The evidence, as proffered, involves alleged deprivation of rights to multiple individuals, thus a "group of persons." Thus, upon the present showing under the circumstances of this case, summary judgment as to defendants' motion for summary judgment is not warranted.

Defendants suggest that, even assuming plaintiff has shown denial of rights to a "group of persons," plaintiff has not met the requirement of raising an issue of general public importance. Where the standard for evaluating this issue is broad, see Hunter 459 F.2d at 218, where the court's role in the determination unsettled, see Bob Lawrence Realty, 474 F.2d at 118, and where determination of this issue may not be necessary to liability in this case depending on resolution of plaintiff's prima facie case of a pattern or practice of discrimination, the court will not undertake a determination of this issue at this juncture.

In sum, where genuine issues of material fact remain for trial, defendants' motion for summary judgment will be denied.

B.      Motion to Exclude Dr. Kane

Plaintiff moves to exclude proposed defense expert Dr. Kane, a former professor of environmental health at East Carolina University, who is proffered by defendants to opine on the causes of mold in units, as alleged by aggrieved persons in their testimony, and whether such mold was the cause of health problems claimed by aggrieved persons. Plaintiff argues that Dr. Kane is not qualified to testify as an expert in the areas he offered opinions, pursuant to Federal Rule of Evidence 702. Plaintiff also argues that Dr. Kane's opinions are not reliable because they are not based on sound scientific methods or proper sources, and because they are speculative.

In light of the procedural posture of this case, the court finds premature plaintiff's motion to exclude expert testimony of Dr. Kane, where the testimony proffered has no relevance to the liability stage of trial, at which plaintiff must establish a prima facie case of race discrimination. At this stage of trial, the issues raised in Dr. Kane's expert report regarding the actual causes of mold in units, as described by aggrieved persons in their testimony, and whether such mold was the cause of health problems claimed by aggrieved persons, do not have a bearing on whether defendants discriminated on the basis of race in the provision of housing benefits.

To the extent defendants seek to introduce evidence to rebut the prima facie showing of race discrimination through evidence that defendants had a non-discriminatory reason for denying repairs or maintenance to black tenants, (e.g., defendants believed repairs of mold conditions were not warranted, or believed they had a basis to withhold repairs), defendants may still do so. Determination of the actual cause of mold in each unit and any alleged health defects at the time of the challenged actions is not relevant to this analysis. Indeed, "it is not [the court's] province to decide whether the reason [for the challenged action] was wise, fair, or <u>even correct</u>, ultimately so long as it truly was the reason for the [challenged action]." <u>Hawkins v. PepsiCo., Inc.</u>, 203 F.3d 274, 279 (4th Cir. 2000) (emphasis added). In other words, defendants need not and should not rely upon expert testimony in their rebuttal of plaintiff's prima facie case of a pattern or practice of discrimination.[7]

Therefore, where the testimony sought to be excluded is not relevant to the initial, liability, phase of trial, the court will deny without prejudice plaintiff's motion to exclude. Plaintiff may

---

[7] The court notes, moreover, that defendants do not mention, much less rely upon, expert testimony by Dr. Kane in support of their motion for summary judgment.

renew the motion in the event the case proceeds to the remedy phase of the case and defendants seek to introduce the testimony to support their theory of damages.

C.     Motion for Sanctions

Defendants move for sanctions on the basis that plaintiff's counsel failed to conduct a reasonable pre-suit inquiry into the claims, continued to advocate claims even after discovery revealed them to be meritless, and attempted to fabricate evidence.

Rule 11 provides that when filing pleadings or motions with the court, an attorney or unrepresented party certifies that to the best of that persons's knowledge, the filing satisfies certain requirements. Fed. R. Civ. P. 11(b). These requirements include that the filing is not made for an improper purpose, that the claims are warranted by existing law, factual contentions have evidentiary support, and denials of contentions are warranted. See id. A party may move for sanctions when another party's conduct does not conform with Rule 11. If, after notice and reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule. Fed. R. Civ. P. 11(c)(1).

"[A]ssessment of frivolousness and attorneys' fees are best left to the sound discretion of the trial court after a thorough evaluation of the record and appropriate factfinding." Blue v. U.S. Dep't of Army, 914 F.2d 525, 538 (4th Cir. 1990). "Rule 11 sanctions are appropriate when a lawyer attempts to use discovery to support outrageous and frivolous claims for which there is no factual support." In re Kunstler, 914 F.2d 505, 515 (4th Cir. 1990) "[A] line undoubtedly exists which separates efforts to attack discrimination in its subtler forms from baseless accusations of discrimination." Id. at 544.

Upon review of the record as a whole, in light of these principles, the court deems meritless defendants' motion for sanctions. Defendants' arguments as to the lack of factual basis for the allegations of the complaint and claims following discovery go to the weight of the evidence, which the court has evaluated herein in denying defendants' motion for summary judgment. As addressed in that summary judgment determination, to the extent defendants' contend that testimony by plaintiff's witnesses is uncorroborated, incredible, or contradicted by other evidence in the record, defendants may present these deficiencies to the jury, who will be charged with weighing the evidence and determining the credibility of witnesses. Furthermore, defendants' argument that plaintiff engaged in sanctionable conduct by attempting to fabricate evidence also is unfounded. Plaintiff's pursuit of potential witnesses who could lend further support for plaintiff's claim reveals, based on the present record, no more than the challenges faced by plaintiff in an "effort[] to attack discrimination in its subtler forms." Id. at 544.

Accordingly, plaintiff's motion for sanctions must be denied.

D.      Pre-trial scheduling

In light of the court's summary judgment determination, this case now will proceed to a bifurcated jury trial. In the first, liability, phase of trial, plaintiff has the burden of establishing a prima facie case of a pattern or practice of discrimination through denial of rights guaranteed by the FHA. Then, in the event plaintiff meets its burden in the first phase of trial, the case will proceed to a second, remedy, phase of trial, at which plaintiff has the burden of establishing the right to damages and other relief, and the extent thereof, for individual aggrieved persons.

The parties are directed to confer and to make a joint report to the court within **fourteen (14) days** as to the estimated length of the first phase of trial, three alternative suggested trial dates, and

suggested alternative dispute resolution techniques to be employed prior to trial in attempt to resolve remaining issues between the parties. Thereafter, the court will enter a scheduling order setting forth pretrial deadlines and requirements, keyed off of the date of trial once established.

## CONCLUSION

Based on the foregoing, the court DENIES defendants' motion for summary judgment (DE 102), and DENIES defendants' motion for sanctions (DE 112). Plaintiff's motion to exclude (DE 104) is DENIED WITHOUT PREJUDICE. The parties are directed to confer and to make a joint report to the court within **fourteen (14) days** with respect to the first phase of a bifurcated trial and alternative dispute resolution, as set forth in more detail herein.

SO ORDERED, this the 13th day of August, 2014.


LOUISE W. FLANAGAN
United States District Judge